IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 22, 2000

## STATE OF TENNESSEE v. DEBORAH GRAHAM & DENICE SMITH

Direct Appeal from the Circuit Court for Cocke County
Nos. 7145,7146     Rex H. Ogle, Judge

No. E1999-02248-CCA-R3-CD
March 29, 2001

After a jury trial, a Cocke County jury found the Defendants, Deborah Graham and Denice Smith, guilty of the first degree murder of Aaron Smith. Following a sentencing hearing, the trial court sentenced both Defendants to life imprisonment with the possibility of parole. In this appeal as of right, the Defendants raise the following issues: 1) whether the trial court erred in not dismissing the indictments because of the State's failure to provide the Defendants with a speedy trial; 2) whether the trial court erred by allowing the State to decide not to consolidate Alexandro Rivera's case with the Defendants' case, because of a potential Bruton problem, without first granting the Defendants an opportunity to be heard on the issue; 3) whether the trial court erred in failing to sever Defendant Smith's case from Defendant Graham's case; 4) whether the trial court erred in consolidating Defendant Graham's case with Defendant Smith's case; and 5) whether the evidence was sufficient to convict each of the Defendants of first degree murder. After a thorough review of the evidence and the applicable law, we affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOE G. RILEY, J., joined.

R.B. Baird, III, Rogersville, Tennessee, for the appellant, Deborah Graham; and Denise Terry Stapleton, Morristown, Tennessee, for the appellant, Denice Smith.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussmann, Assistant Attorney General; Al Schmutzer, District Attorney; W. Brownlow Marsh, Assistant District Attorney; and James B. Dunn, Assistant District Attorney, for the appellee, State of Tennessee.

**OPINION**

# FACTS

Harry Smith, the victim's father, testified that, at the time of the murder of his son, Aaron Smith, he and his wife operated a campground called Camprite Acres. Aaron Smith and Defendant Smith were married and lived in a house on the campgrounds. (Defendant Smith and Defendant Graham are twin sisters.) The campsite had a gated entrance, which required those using the campgrounds to have a key card to gain entrance, and Defendant Smith had one of these key cards. In 1995, Harry Smith began to notice that Defendant Smith and the victim were experiencing marital problems. Later, the victim moved in with his parents, while Defendant Smith continued to live in the marital home. At some point, the victim filed for divorce. Subsequently, Defendant Smith also filed for a divorce and a custody battle ensued. Following Aaron's death, Harry Smith and his wife, Cleta, attained custody of their grandchildren, Brittany and Joshua.

Smith further testified that, on July 23, 1997, he left home at approximately 4:20 p.m., but the victim was not home at this time. He later returned at 6:00 p.m. to find a shoe sitting on a little rock wall that ran along the walkway. As he drove up the walkway, Smith saw the victim's body laying on the sidewalk. He got out of his truck and went into the house to call 911, where he found that someone had completely ransacked the house. As he waited for the police to arrive, he was careful not to touch anything. Smith noticed that someone had removed the covering from an air vent, which he found strange, because he formerly hid his money in a similar place, when he lived in Florida. Smith stated that the victim and Defendant Smith knew about his practice of hiding money in the air vent.

Smith also told the jury that he owned a .357 magnum pistol, which he normally stored under a table in the garage. After finding his son dead, Smith found his .357 magnum out of place. Smith testified that he also had three watches missing. On cross-examination, Smith testified that, on the day of the murder, he was working on the road by the gate and did not see anyone come in or out of the campgrounds. On the day after the murder, Defendant Smith called, identified herself and asked about the victim, but Smith gave the phone to Agent Davenport of the Tennessee Bureau of Investigation (TBI).

Robert Caldwell, the Chief Detective of the Cocke County Sheriff's Department, testified that he went to Camprite Acres Campground to investigate the murder of Aaron Smith. When Caldwell arrived at the Smith home, he saw the body of Aaron Smith lying on the walkway leading to the house. Caldwell, along with Agent Davenport of the TBI, requested an autopsy of the victim's body. Dr. Cleland Blake performed the autopsy. Caldwell also requested that the TBI Crime Investigation Team help with the investigation.

Dr. Cleland Blake, an Assistant State Chief Medical Examiner, testified that he received a request to perform an autopsy on the victim. Dr. Blake found three gunshot wounds on the victim's body--two to the head and one to the trunk. Dr. Blake discovered that one head wound destroyed the victim's brain and served as the only immediately lethal wound to the victim's body. The second wound, which entered the front portion of the right ear, went through the ear and was not lethal and hit no vital "structures". The third wound (also not lethal) entered the left rear portion of the victim's

-2-

body at waist level and exited through the front right side of the victim's chest. Dr. Blake concluded his testimony by noting that the victim received two gunshot wounds from the back (i.e., the shots to the head and the waist) and one from the front (i.e., the shot to the ear).

Kelly Smith, a TBI forensic scientist, testified that she was a member of the Violent Crime Response Team that went to Camprite Acres Campground to document, preserve and collect forensic evidence. When Agent Smith and her team arrived at the Smith home, she saw a walkway leading to the front of the house and another entrance through the garage. Agent Smith stated that someone had removed the victim's body before her team arrived at the scene. The team used yellow markers to mark the location of evidence before they packaged the evidence. Agent Smith's team marked evidence outside the home and then entered the interior of the home through the garage. The team collected the evidence and took photographs of the evidence found at the scene. Specifically, the team collected a sample of reddish-brown stains (later stipulated as human blood), a spent bullet and a handgun (stipulated as the gun from which the spent bullet was fired). Agent Smith also found a pair of handcuffs on a chair in the living room of the home. Agent Smith made sketches of the crime scene, which the State introduced into evidence, along with several photographs made of the interior and the exterior of the home. Agent Smith told the jury that several pieces of clothing and other articles were scattered throughout the house. The State later recalled Harry Smith and he testified that he had never before seen the handcuffs found by Agent Smith's team. Further, Harry Smith stated that the handcuffs did not belong to his son or anyone else in his family.

Hoyt Phillips, a latent fingerprint examiner with the TBI, testified that he examined evidence taken from the Smith home. Phillips stated that he examined the .357 magnum found at the crime scene, but no readable latent fingerprints were found on the gun. Phillips could not say whether any fingerprints may have been wiped off the gun. Also, Phillips testified that he was unable to recover any readable latent fingerprints from the handcuffs found at the crime scene. Of all the evidence examined by Phillips, he found four identifiable prints belonging to the victim, Aaron Smith.

Sharon Jarvis testified that she kept Defendant Smith's two children at her in-home daycare center during the summer of 1996. Jarvis told the jury that Defendant Smith told her about the divorce and custody battle that Defendant Smith and the victim were going through. Jarvis stated that Defendant Smith told her on three different occasions that if Aaron got custody of the children, she would kill Aaron or have him killed before she would lose her children. Jarvis testified that Defendant Smith told her these things once on the telephone and twice in Jarvis' home. Jarvis further explained that during these conversations, Defendant Smith would be very emotional and "adamant" about her intent to prevent the victim from attaining custody of the children. However, Jarvis did not report or tell anyone about Defendant Smith's threats or intentions. On cross-examination, Jarvis testified that the three conversations she had with Defendant Smith occurred a year before the death of Aaron Smith. Jarvis further testified that she believed the statements made by Defendant Smith, but also stated that she did not think Defendant Smith would actually carry out the threats. Finally, Jarvis stated that the last time she saw Defendant Smith was when Defendant Smith came to Jarvis' home to get a refund on two days worth of daycare and to ask Jarvis to testify at the divorce hearing.

Charles Jack Snyder testified that he was working at the post office in Gatlinburg, Tennessee, when he received a phone call from a Carl Sanders. Sanders said he was from Bismark, North Dakota, and that he was calling from a payphone. Sanders told Snyder that an express mail package containing drugs and addressed to an Aaron Smith would be coming to the post office. Sanders supplied Snyder with the special delivery number for the package. When the package arrived, Snyder gave the package to Scott Ginsell, the acting supervisor, and the two contacted the postal inspectors. Russell Fallis, a postal inspector, retrieved the package.

Russell Fallis testified that he went to Gatlinburg to investigate an alleged shipment of drugs. Fallis contacted Randy Parton and Richie McMahan, agents with the Fourth Judicial District Task Force, to assist him with the investigation. When Fallis arrived at the post office in Gatlinburg, he spoke with Charles Snyder and got the information about the phone call Snyder had received. Fallis examined the package, addressed to "Aaron Smith, Earthquake Museum International, 653 Parkway, Gatlinburg, Tennessee 37738." The package was from "S. Jones, 1411 Peachtree Circle, Atlanta, Georgia." Fallis later discovered that the return address did not exist. However, Fallis determined that the package was mailed from the Dr. Martin Luther King Post Office in Miami, Florida.

Fallis further testified that he did not open the package immediately, because he needed a search warrant. Fallis posed as a postal carrier and delivered the package, intact, to Aaron Smith at the Earthquake Museum. As Fallis approached Aaron Smith, Smith was sitting at the entrance to the Earthquake Museum ride taking tickets and money. Fallis asked, "Are you Aaron Smith?" and Smith said, "Yes." Aaron Smith signed for the package, and as Fallis walked away, he saw Smith open the package. At that point, the Task Force agents approached Aaron Smith and identified themselves as narcotics agents. Fallis returned and identified himself as a postal inspector. Smith immediately yelled, "I've been set up," and then called for his boss. Smith allowed Fallis and the agents to examine the inner envelope found in the package, and they found "two extremely small Ziploc bags that had a yellowish-whitish powder substance" in them. The writing on the inner envelope read, "To Aaron Smith, next time the price goes up." Fallis turned the powdery substance over to the drug agents for testing. Later, the TBI lab identified the substance "as being cocaine-base[d], a Schedule II controlled substance." Fallis sent the package and the inner envelope to Memphis to be checked for fingerprints. Bobby Ewing, of the Memphis crime lab, examined the package. Aaron Smith was never arrested for the drugs found in the package.

Bobby Ewing, a forensic latent print analyst for the U.S. Postal Service Memphis Laboratory, testified that he examined the express delivery package sent to Aaron Smith. Ewing stated that he found no readable prints on the package itself; however, he did find five readable prints on the label of the package. Ewing testified that he received a ten roll fingerprint card signed by Defendant Deborah Graham, which Officer Rick Russell had taken. Ewing determined that the latent fingerprints found on the original label of the package were the finger impressions of Defendant Graham. He also developed fingerprints from the inner envelope, and found that "six latent fingerprints of value for identification purposes" belonged to Defendant Graham. On cross-examination, Ewing testified that, while other smudges or impressions were on the materials he examined, "all latent prints that were of value for identification purposes" belonged to Defendant Graham.

-4-

Melanie Hearst and Christen Latham testified that they worked with Defendant Smith in the dental office of Dr. Steve Madison. Hearst and Latham stated that often Defendant Smith told them about the marital difficulties she was having with the victim, Aaron Smith. A couple of years before the victim's death, Defendant Smith told Latham that Aaron Smith had choked her while they were on a cruise. Defendant Smith also told Latham that Aaron Smith was abusive to the two children. Hearst and Latham testified that, more than once, Defendant Smith said that, if Aaron Smith got custody of the children, "she would kill him or have him killed." Hearst testified that as the custody hearing neared, Defendant Smith became more upset and distraught. Latham further testified that, on July 17, 1997 (six days before the homicide), Defendant Smith came to the dental office to pick up her check, and she appeared upset and shaken. Defendant Smith's car was packed and her father was with her in another vehicle.

On cross-examination, Hearst told the jury that she often saw bruises on Defendant Smith, which the Defendant said Aaron Smith had caused. Also, Hearst and Latham admitted that they never believed Defendant Smith would actually kill Aaron Smith. Hearst thought that Defendant Smith was "just under pressure and she was just stressed," when she spoke those words. Neither Hearst nor Latham reported this information to the police.

Next, twelve-year-old Brittany Smith (the daughter of the victim and Defendant Smith) testified. She stated that, two days after a court had granted custody of her and her brother (Joshua) to Aaron Smith, Defendant Smith took them to Florida to see Defendant Graham (Defendant Smith's twin sister). Her grandfather, Don Graham, accompanied them. They drove through the night and arrived at a motel in Miami. At some point, they met Defendant Graham, two different men who were named "George," and an "Alex," behind a place called The Golden Nugget. While Defendant Smith and Don Graham talked with the men, Defendant Graham took Brittany and Joshua to the beach for about an hour. During her testimony, Brittany also identified a photo of "Alex," who was later identified as Alexandro Rivera.

Brittany further testified that, while they were in Florida, they stayed at The Driftwood motel. Also, during this time, Defendant Smith purchased another car. At some point, Alex, Defendant Graham and both Georges left in Defendant Smith's new car and did not return for two or three days. During that same period, Defendant Smith also left for a day. Late one night, the Defendants, Alex and one of the Georges returned to the motel, while Brittany and Joshua were asleep. Brittany stated that loud speaking awakened her and she overheard Defendant Graham say "they hurt somebody." Then, Defendant Smith said, "it was easy," and Alex replied, "No, we've killed somebody." Brittany never heard whom they had killed.

Brittany also recalled that, before everyone left for those couple of days, Alex "had a pair of handcuffs in his back pocket." However, when she next saw Alex, he no longer had the handcuffs. Brittany testified that she noticed that Alex was wearing one of her "papaw's [Harry Smith] watches" and that Defendant Graham was wearing a pink ice ring that belonged to her "mamaw" (Cleta Smith). Two days later, Defendant Smith took the children to Michigan, and they stayed at the home of Brittany's Aunt Marian and Uncle Jerry. At some point, Aunt Marian brought Brittany and Joshua back to Tennessee, where they currently reside with their grandparents, Harry and Cleta Smith. On

cross-examination, Brittany testified that they were in Florida for approximately five days. Also, Brittany stated that Defendant Graham was with her and Joshua almost every day, during the five days they were in Florida. Brittany recalled some things they did in Florida, including going with Defendant Smith to rent a car, but she was unable to recall specific activities. Brittany testified that she first learned of her father's death while she was in Michigan.

The parties stipulated that Defendant Smith rented a 1996 Buick Regal from Alamo Rentals in Miami from July 21, 1997 to July 28, 1997. The mileage on the car was 25, 734, when rented, and 28, 210, when returned. Defendant Smith signed for the car in her own name and provided her Tennessee Driver's License, her home address, and her work address to the employees of Alamo.

Vernon Brown testified that he and his wife own a lot at Camprite Acres, which the victim sold to them. Brown stated that they were at the campground the day someone killed Aaron Smith. Brown testified that, at approximately 4:00 that afternoon, he and his wife were walking to the pool, when they saw Harry Smith leaving his home. Then, Brown noticed two people sitting at a picnic table on the deck of a trailer. Brown could only see that one person was blond and was wearing shorts. As Brown and his wife prepared to leave the pool and bath house, they noticed someone (it appeared to be a man) knocking on Harry Smith's door. (This was about fifteen minutes after they had been at the pool.) Brown and his wife returned to their trailer. Between 4:30 and 5:00 p.m., Brown heard three gunshots coming from the direction of Harry Smith's home. Brown was sure of the time, because he and his wife had scheduled to have dinner with some neighbors at 5:00 p.m. and it was 5:00 when they arrived at the neighbor's house. Brown also testified that, because they often heard gunshots around the campgrounds, he did not think anything was wrong when he heard the three gunshots. However, Brown later learned that someone had been murdered when the police came to the neighbor's camper.

Brown stated, on cross-examination, that he told the police that the man he saw knocking on the Smiths' door was a "skinny white male with long dark hair." Also, Brown testified that the distance from the pool to Harry Smith's house was about 200 feet. On redirect, Brown stated that he had also seen a white car parked on one lot. Brown further testified that at around 5:00 p.m. he heard a car leaving in a hurry. At approximately 5:15 p.m., Brown learned from the neighbor's daughter that the white car was no longer there.

State Trooper Eddie Pulley testified that he worked in McMinn County. Pulley testified that, on July 23, 1997 at 7:41 p.m., he issued a ticket to a David Antonio Rivera of Miami, Florida. Pulley stated that Rivera was driving a white, 1996 four-door Buick. Pulley testified that he could not remember Rivera's face or whether Rivera was traveling with one or two females.

Special Agent Ron Raccioppi, of the Florida Department of Law in Miami, testified that in August of 1997, Agent Davenport of the TBI contacted him about "coming to Florida to do a follow-up investigation on a homicide." Specifically, Agent Raccioppi and Agent Davenport were looking for information on an "Alex," a Deborah Graham and the activities of Denice Smith, while she was in Florida. They received information from a club owner regarding the tag of a vehicle in which Alex had just left the club. The tag number led the agents to a LaShawn Taylor in Miami. The

agents set up surveillance, which finally led them to the man named Alex, who agreed to help the agents in their investigation. The agents learned, from Alex's driver's license (which was later determined to be a false identification) and social security card, that his purported name was David Antonio Rivera.

Raccioppi further testified that he and Agent Davenport learned that the address on David Rivera's driver's license was the same as LaShawn Taylor's address. Also, Raccioppi stated that the Martin Luther King Post Office in Miami is 300 yards west of Rivera and Taylor's address. The agents conducted their surveillance of Taylor's home from the parking lot of the Martin Luther King post office. Finally, Raccioppi testified that their investigation revealed that someone had taken Defendant Graham to the airport, where she boarded a flight to New York.

David Hutchison, a Criminal Investigator with the Cocke County District Attorney's Office, testified that he traveled to New York to locate and arrest Defendant Graham. On August 22, 1997, Hutchison arrested Defendant Graham and gave her the Miranda admonitions. Defendant Graham waived her Miranda rights and gave the New York Police Department and Investigator Hutchison a signed and written statement, which Hutchison read into the record at trial.

In her statement, Defendant Graham said that she and Alex borrowed the car, rented by Defendant Smith, to travel to Michigan. Alex and Defendant Graham planned to stop in Tennessee and pay a visit to the victim. Defendant Graham stated that Alex wanted to teach Aaron Smith a lesson, because Alex had heard that Aaron Smith was abusive to Defendant Smith and their children. Graham used Defendant Smith's gate card to gain entrance to the campgrounds and show Alex where Aaron Smith lived. Graham and Alex stayed at the campground for about ten minutes. Then, Alex drove Graham back to Gatlinburg and let her out in front of the Ramada Inn. Graham said that she thought that Alex was "just going to talk to Aaron and ask him if he wanted to fight someone besides women and children." Rivera returned two hours later, pale and upset. As they drove toward the interstate, Alex told Graham that he had gone back to the Smith house and entered through the garage. As Alex was going through the house, he found several guns. Aaron Smith returned home unexpectedly and surprised Alex. Alex told Graham that "he [Aaron Smith] surprised me. I had to cap him." Alex shot Aaron three times and then Alex went back into the house to make it look like someone had burglarized the home. Then, Alex threw two handguns in the woods and kept one handgun for himself.

After hearing this, Graham said she could not go to Michigan, so the two returned to Florida. When Graham arrived at The Driftwood motel in Miami, she discovered that her father, Defendant Smith and Smith's children had gone back to Tennessee to turn themselves in to the police. Graham returned the rental car. She told Hutchison that Alex said "[I]f [she] ever told what he had -- what he had done, that he would let his boys know and they would take care of [her] whole family." Graham stated that she never saw Alex with any jewelry after he killed Aaron, but she said that he had given her a "gray plastic bag containing several gold necklaces and bracelets," which he had planned to give to LaShawn Taylor. Further, Graham said that on the way back to Florida, Alex got a speeding ticket in McMinn County. The last time Graham saw Alex was August 2, 1997, when LaShawn Taylor took Graham to the Miami airport to catch a flight to New York.

On cross-examination, Investigator Hutchison acknowledged that, initially, Graham told him several times that she had not killed anyone. Additionally, Hutchison admitted that he told Graham that someone had identified her, as being at the campground pool the day Aaron Smith was killed, although this was not true. On redirect, Hutchison testified that, before Graham gave her written statement, she stated that she and Alex had not gone to Tennessee, but straight to Michigan to visit friends. However, when Hutchison told Graham that someone had seen her by the campground pool, Graham decided to change her story.

LaShawn Taylor testified that she and Alexandro Rivera have a son together and that they lived together for a short time in Miami, Florida. Taylor said that she met Defendant Graham during the summer of 1997, before Alex and Graham went to Tennessee together. After Graham and Alex returned to Miami, Taylor next saw Defendant Graham, when Graham came to Taylor's home in a white car to see Alex. Alex went outside to talk with Graham, while Taylor waited at the door. Taylor testified that she overheard Alex tell Graham "to get the car out of there." The next time Taylor saw Graham, Graham stayed two nights at Taylor's home. During this stay, Alex and Graham "were very secretive, always talking, going to the phones [pay phones], you know, whispering." Taylor said that Graham was constantly calling her father. At the end of the two days, Taylor took Graham to the airport to catch a flight to New York. Several days after Graham left, the police stopped Taylor and Rivera. Taylor further testified that the Florida driver's license carried by Alex Rivera, bore Alex's picture, but that the name on the license (David Rivera) was Alex's brother's name. Taylor also testified that she had gone with Alex to a pawn shop, where he redeemed several items, including a Noah's Ark bracelet.

Robert Latta, an employee at the Cash In Pawn Shop in Miami, testified that Alex Rivera pawned an Elgin pocket watch, a gold Noah's Ark bracelet, two women's freeform rings and a Nikon camera. Alex Rivera retrieved these items on August 7, 1997.

Paul Dosler, a detective with the Port Authority Police Department in New York, testified that he aided Tennessee investigators with the arrest of Defendant Graham. They arrested Graham at the home of Martin Giovi in Astoria, New York. Dosler testified that he recovered a bag of costume jewelry from Giovi's home, which contained 11 pieces of jewelry. In court, Dosler identified the 11 pieces of jewelry and described the bag that contained the jewelry as "a gray-colored plastic bag."

Cleta Smith, the victim's mother, identified the costume jewelry recovered by Paul Dosler from Martin Giovi's apartment, as the jewelry taken from her home the same day someone killed Aaron. She also told the jury that several other items were taken from her home, including a pink ice ring, a Noah's Ark bracelet and a Nikon camera.

Martin Giovi testified that he and Defendant Graham had previously lived together and that during this time, Graham asked him to kill Aaron Smith about three or four times, but Giovi refused. Giovi testified that, while Graham was living with him in New York in August of 1997, she was constantly using a pay phone to call her father and sister. Giovi stated that Graham behaved so nervously that he finally asked her what was wrong. Graham told Giovi, "[I]t is finally done. And

[Giovi] said, 'What's done?'" Graham replied, "Aaron is dead." Giovi testified that Graham told him that she and Don Graham (the Defendants' father) had paid someone to kill Aaron. Giovi further testified that Graham told him that she had gone to Aaron's home with a man from Florida, and they had shot Aaron in the driveway or on the walkway. Shocked by Graham's news, Giovi left the apartment and when he returned, he saw numerous police officers in front of his house. The police arrested Graham. Later, Giovi allowed the police to return to his apartment and he gave them a bag containing costume jewelry, which Graham had left in Giovi's apartment.

Shannon Jarnigan testified that, while she was an inmate in the Cocke County Jail, Defendant Smith said "she hired her twin sister's boyfriend to kill her husband," because her husband had sexually molested the children and physically abused her. Jarnigan also met Defendant Graham, who told Jarnigan that her boyfriend, Alex, had accidentally shot Aaron Smith. Jarnigan said that Graham told her that she (Graham) was afraid of Alex and that, after the shooting, Alex would not let Graham out of his sight. On cross-examination, Jarnigan admitted that the State had charged her with felony murder and aggravated robbery in an unrelated case and that, after she gave the authorities the information she had on this case, she pled guilty to two counts of attempted aggravated robbery. Jarnigan acknowledged that she told her attorney that she wanted to use this information to help herself. However, Jarnigan denied making any deals with the State. The State subsequently recalled Detective Robert Caldwell, who testified that the State reduced the charges in Jarnigan's case because an autopsy was never performed on the deceased victim's body and the other victim (the key witness) could not be found.

Sandra Strange testified that she knew Defendant Smith from Smith's visits to Tanfastic Tanning Salon. Strange told the jury that, once, Smith asked Strange if she knew someone who could kill her husband. Strange further stated that Smith said that Aaron Smith was abusive to her and the children. Also, Smith told Strange that, if the court gave Aaron Smith custody of the children, she would either run away with the children or have Aaron killed. However, Strange admitted that she did not take Smith's statements seriously.

The State rested its case-in-chief at this point.

Diane Levy, the Executive Director of Safe Space (a domestic violence program), testified that Defendant Smith contacted her organization in 1996 out of concern for the safety of her children. Levy testified that Smith also contacted Safe Space after Judge Vance rendered his decision in the divorce and custody case. On July 25, 1997, Levy spoke with Smith, who stated she was returning to Tennessee to turn herself in to the police. Levy advised Smith to contact the Public Defender's office.

Judy Laws testified that she, Defendant Smith and Shannon Jarnigan were simultaneously incarcerated at the Cocke County Jail in February of 1998. One morning, Laws observed Jarnigan going through Smith's personal papers. Laws testified that Jarnigan said, "I'm going to get something, anything I can get to make a deal with." Jarnigan further stated, "My attorney says if I can get something on him (sic), that he'll cut me some slack and make a deal for me." Finally, Smith got out of the shower and took the papers away from Jarnigan. On rebuttal, the State recalled

Detective Robert Caldwell again and he testified that, on November 7, 1997, he took Jarnigan's statement about Defendant Smith saying that she hired her twin sister's boyfriend to kill her husband.

At the close of all the proof, the judge charged the jury on first degree murder, second degree murder and facilitation of first and second degree murder. Following deliberations, the jury convicted both Defendants of first degree murder. During the sentencing phase, the jury rejected the State's one enhancement factor, as applied to each Defendant, and sentenced both Defendants to life imprisonment with the possibility of parole.

## ANALYSIS

### I. Right to a Speedy Trial

In their first issue, the Defendants assert that the trial court violated their right to a speedy trial as guaranteed under the United States Constitution, the Tennessee Constitution, and Tennessee Code Annotated § 40-14-101, and that the charges against them should be dismissed pursuant to Tenn. R. Crim. P. 48. The State concedes the appropriateness of an inquiry into the delay between the Defendants' arrest and their trial on June 16, 1999, but argues that the delay was not due to improper actions by the State and was not prejudicial to the Defendants. Therefore, the State's position is that the Defendants' right to a speedy trial was not violated. After a review of the record, we are unable to find that the Defendants' right to a speedy trial was violated.

The record is sparse concerning this issue. On appeal, allegations found in pleadings and statements made by counsel during a hearing or the trial are not evidence. See State v. Draper, 800 S.W.2d 489, 493 (1990). We are unable to consider either in lieu of a verbatim transcript. The same is true for the recitation of facts and argument contained in appellate briefs submitted to this Court. Id.

When the record is incomplete, and does not contain a transcript or statement of what transpired in the trial court with respect to the issue raised on appeal, we are precluded from considering that issue. Id. Further, an appellate court is also prohibited from considering the exhibits attached to motions and supplements to the motions that are included in the "technical" record. State v. Bennett, 798 S.W.2d 783, 789-90 (Tenn. Crim. App. 1990). This Court can only consider an exhibit or an attachment to a pleading that has been (a) received into evidence, (b) marked by the trial judge, clerk or court reporter as having been received into evidence as an exhibit, and (c) included in the transcript transmitted to this Court. Id. Thus, in the absence of a complete record on appeal, the appellate court must conclusively presume that the ruling of the trial judge was correct.

In the instant case, the record transmitted to this Court did not contain a transcription of the relevant proceedings in the trial court concerning this issue. The Defendants failed to provide this Court with evidence from a hearing or a statement of the evidence from a proceeding, wherein the trial court denied the Defendants' motion for a speedy trial. Concerning the speedy trial issue, the record on appeal merely consists of an order overruling Defendant Smith's "motion for a speedy trial

or in the alternative to set bond," and statements made by the trial court concerning the denial of the Defendants' motion to dismiss for not having a speedy trial, at another pre-trial motion hearing. However, the order overruling Defendant Smith's motion does not show what, if any, findings were made by the trial court regarding the motion. Moreover, the following colloquy between the trial court and the attorneys, at another pretrial motion hearing, provides no basis for consideration of the Defendants' assertions on appeal:

> The Court: Yeah. And so it's been set. I'm not--look, folks, the issue on a speedy trial the Court's already dealt with. I set it [the trial date]. You all had conflicts. I re-set it. The State had a conflict at one time and I've done the best I can so whatever happens, happens.

> Mr. Baird [Graham's Counsel]: My point was, Judge, I've not seen an order to that regard in the file so I just wanted to bring that to the Court's attention.

> The Court: Yeah, well, I need an Order to reflect all that.

> Gen. Marsh: We'll have it for you today.

> The Court: So the issue on the Motion for a Speedy Trial, the Court's already dealt with and I'm not going to deal with that again.

Thus, absent proof and findings, we presume the trial court ruled correctly on the issue pertaining to Defendants' right to a speedy trial.

## II. Right to be heard on whether a Bruton problem prohibited the consolidation of Alexandro Rivera's trial with the Defendants' Trial

Next, the Defendants contend that the trial court violated their rights to procedural due process by depriving them of an opportunity to be heard on the issue of whether a Bruton violation existed, which would serve to exclude Rivera from being tried jointly with them. See Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968) (holding it a violation of a defendant's Sixth Amendment right to confront and cross-examine witnesses, when a court admits evidence of pretrial statements made by a co-defendant to implicate the defendant's guilt). As a preliminary matter, we note that the Defendants have waived this issue by failing to include it in their respective motions for a new trial. Tenn. R. App. P. 3(e); State v. Maddox, 957 S.W.2d 547, 553 (Tenn. Crim. App. 1997). Even if not waived, Defendants would not be entitled to relief on this issue.

Article I, § 9 of the Tennessee Constitution provides that "the accused hath the right to be heard by himself and his counsel." Based upon the record, we find that while the Defendants had

-11-

the right to be heard, neither defense counsel requested an opportunity to be heard on whether a Bruton problem existed. At the pretrial motions hearing, both defense counsel argued that Smith, Graham and Rivera should either be tried all together or all separately. The State argued for the consolidation of Graham and Smith's cases pursuant to Tennessee Rules of Criminal Procedure 13, given that the two were indicted separately. During the course of the State's motion for consolidation, the State explained to the trial court that, while it desired to try Graham, Smith and Rivera jointly, Defendant Graham's statement, identifying Rivera as the shooter, presented a Bruton problem, which prohibited the consolidation of the three cases. The trial court accepted the State's assessment of the Bruton issue and ordered that Graham and Smith's cases be consolidated. Thus, the record indicates that the State never sought to join Rivera's case with Defendant Smith's and Defendant Graham's cases.

First, the Defendants challenge the State's decision to consolidate their cases, without consolidating Rivera. Rule 12 of the Tennessee Rules of Criminal Procedure requires that a request to consolidate be raised prior to trial. Tenn. R. Crim. P. 12(b)(5). Rule 13 of the Tennessee Rules of Criminal Procedure permits the trial court to consolidate the cases of defendants, when the State could have opted to join the defendants in a single indictment. Tenn. R. Crim. P. 13(a). As such, it is the State's decision (as well as a defendant's decision) whether to file a motion to consolidate defendants. In this case, the State elected to move for a consolidation of Smith and Graham's cases, which was within the State's prerogative. The State would have liked to join all three cases, but a Bruton violation made it necessary for Rivera's case to remain separate. In contrast, joinder of Graham and Smith was clearly permissible under Rules 8(c) and 13(a) of the Tennessee Rules of Criminal Procedure. Moreover, the Defendants were not entitled to a hearing on the State's internal decision to file or not to file a motion to consolidate.

Second, the record indicates that the Defendants were present in court when the trial court made the ruling addressing the Bruton issue. The Defendants offered no specific argument against the State's argument for the application of Bruton, as it related to Rivera. Therefore, because Defendants failed to request an opportunity to be heard at the pretrial motions hearing and failed to raise this issue in their motions for a new trial, we find no violation of their rights to due process.

### III. Severance and Consolidation

Defendant Smith claims the trial court erred in denying her motion to sever her trial from Defendant Graham's trial. Defendant Graham claims the trial court erred in consolidating her case with that of Defendant Smith, because the evidence against Smith was stronger. Essentially, each Defendant argues that because the evidence against the other was more sufficient, joinder of their trials produced a spill-over effect, which permitted one to be prejudiced by the multitude of evidence against the other. The State contends the trial court acted properly, because the case against the Defendants presented a "common scheme or plan," which made consolidation permissible under Rules 8, 13 and 14 of the Tennessee Rules of Criminal Procedure. We find that the trial court properly consolidated the two cases, and properly denied Smith's motion for a severance.

### A. Defendant Smith's Motion for Severance

Defendant Smith contends that the trial court erred in refusing to grant her a severance from Defendant Graham. She specifically complains that due to the overwhelming amount of evidence against Defendant Graham, the trial court should have severed her case to prevent any prejudice to her. We believe that the trial court properly declined to grant the severance.

We review a trial court's decision to deny or grant a severance of co-defendants for an abuse of discretion. State v. Little, 854 S.W.2d 643, 648 (Tenn. Crim. App. 1992); see also, State v. Moore, 6 S.W.3d 235, 238 (Tenn. 1999) and State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (holding that a trial court's decision to sever offenses pursuant to Rules 8(b) and 14(b)(1) is to be reviewed for an abuse of discretion). Absent an affirmative showing of prejudice, this Court will not reverse the trial court's exercise of sound discretion. State v. Ensley, 956 S.W.2d 502, 508 (Tenn. Crim. App. 1996). In Woodruff v. State, 164 Tenn. 530, 538-39, 51 S.W.2d 843, 845 (1932), our supreme court noted that:

> The state, as well as the persons accused, is entitled to have its rights protected, and when several persons are charged jointly with a single crime, we think the state is entitled to have the fact of guilt determined and punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants.

Thus, the defendant bears the burden of showing that she was "clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty." Parham v. State, 885 S.W.2d 375, 383 (Tenn. Crim. App. 1994).

Severance of defendants is allowed pursuant to Rules 13(b) and 14(c) of the Tennessee Rules of Criminal Procedure. Here, there is no indication that a severance was "necessary to achieve a fair determination of the guilt or innocence of" the Defendants. Tenn. R. Crim. P. 14(c)(2)(ii) (2000). Further, there is no evidence that a severance was required pursuant to Tennessee Rules of Criminal Procedure 14(c)(1), permitting severance of co-defendants where a Bruton violation would follow (as with Rivera). The Defendants had been separately indicted for Aaron Smith's murder. At the pretrial motions hearing, the trial court, upon motion of the State, consolidated the Defendants' cases under Tenn. R. Crim. P. 13(a), which permits the consolidation of two or more indictments where all defendants could have been joined in a single indictment. The trial court found that the Defendants could have been joined in the same indictment, pursuant to Tenn. R. Crim. P. 8, because each of the Defendants was charged with accountability for the murder of the victim and because the offense charged showed signs of a common scheme or plan. Tenn. R. Crim. P. 8(c)(1) and (3)(i) (2000).

After a review of the record and the law, we are unable to find an abuse of discretion by the trial court. In refusing to sever the Defendants' cases, the trial court correctly applied the law and reached a logical decision based upon the facts as they applied to the law. Defendant Smith has failed to show that she suffered prejudice from her case being consolidated with Defendant Graham's case. Even assuming that the evidence at trial appeared to weigh more heavily against Defendant

Graham, there was a significant amount of evidence showing Defendant Smith's involvement as the one who solicited her twin sister (Defendant Graham) and Rivera to commit the homicide. The trial court determined that the evidence of a common plan or scheme against the individual Defendants would permit the jury to fairly determine the guilt or innocence of the Defendants, thereby eliminating the need for severance.

## B. Defendant Graham's Argument Against Consolidation

Defendant Graham argues that the trial court erred in consolidating her case with Defendant Smith's case. She contends that the evidence clearly showed that only Defendant Smith had a motive for killing Aaron Smith. She asserts that because the jury found that the evidence was insufficient to show that this murder was committed for promise of remuneration, there is no evidence to show that she had any motive for participating in this murder. She further claims that the unreliable testimony of LaShawn Taylor and Martin Giovi made the State's case against her weak, compared to the case against Defendant Smith. Thus, Graham argues that she was prejudiced by the consolidation of her case with Smith's case. We disagree.

Joinder is permissible when each defendant "is charged with accountability for each offense included." Tenn. R. Crim. P. 8(c)(1) (2000). However, the trial court may grant a severance prior to trial if it is necessary "to promote a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(i) & (ii) (2000). As noted above, the decision to grant a severance is within the trial judge's sound discretion, State v. Little, 854 S.W.2d at 648, and the exercise of that discretion will not be reversed absent an affirmative showing of prejudice, State v. Ensley, 956 S.W.2d at 508. Here, each of the Defendants was charged with accountability for the murder of Aaron Smith. Therefore, consolidation of the Defendants' cases was permissible and within the sound discretion of the trial court. Defendant Graham has failed to demonstrate an affirmative showing of prejudice resulting from the consolidation of her case with Defendant Smith's case.

Finally, we find that the trial court protected the Defendants against the risk of prejudice or a possible "spill-over effect," by giving the following jury instructions:

> All right, you are trying two separate cases that have been consolidated for trial. The first indictment, #7145, charges the Defendant Deborah Graham primarily with the offense of first degree murder. The second indictment, #7146, charges Denice Graham Smith with the offense of first degree murder. Both indictments will be handed to you as you consider these charges during your deliberations. In considering each case, it is your duty to weigh carefully the evidence as it applies to each case. If there be evidence that sheds light upon the guilt or innocence in one case, but is immaterial or irrelevant as to the other, be certain that you do not permit the evidence to receive any consideration or have any bearing on your verdict in cases in which it cannot apply.

> In other words, each indictment -- or, in other words, please consider each indictment and each -- each defendant separately, and consider only that portion of the evidence that bears on a precise charge. Do not let your verdict of guilt or innocence on one charge affect your verdict on the other. Your judgment must be independently made as to each charge and each defendant.

We must presume that the jury complied with the trial judge's instruction. Richardson v. Marsh, 481 U.S. 200, 211 (1987); State v. Blackmon, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985), perm. to appeal denied, (Tenn. 1985). The record does not demonstrate that the Defendants sustained prejudice as a result of the joint trial. Further, the trial court did not abuse its discretion by finding that the evidence presented a "common plan or scheme" between the Defendants. Thus, the Defendants are not entitled to relief on this issue.

## IV. Sufficiency of the Evidence

Both Defendants contend that the evidence was insufficient to support their convictions for first degree murder. We disagree.

The proper inquiry for an appellate court determining the sufficiency of evidence to support a conviction, is whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not reweigh or reevaluate the evidence. Id. Nor may this Court substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956).

The standard for appellate review is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Vann, 976 S.W.2d 93, 111 (Tenn. 1998). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (quoting State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985)). A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury. Id.; see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In contrast, the State on appeal is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn from the evidence. See Hall, 8 S.W.3d at 599; Bland, 958 S.W.2d at 659.

Under Tennessee law, first degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1997). A person acts intentionally "when it is the

person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18) (1997). "'[P]remeditation' is an act done after exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d) (1997). Although premeditation requires that "the intent to kill must have been formed prior to the act itself," "[i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d) (1997). The element of premeditation is a question for the jury which may be inferred from the circumstances surrounding the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). Tennessee courts have delineated several circumstances that may be indicative of premeditation, including the use of a deadly weapon upon an unarmed victim, Bland, 958 S.W.2d at 660, facts from which motive may be inferred, State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995), and calmness immediately after the killing, Bland, 958 S.W.2d at 660.

Accomplice liability provides a basis for the convictions of Defendants Graham and Smith. Tenn. Code Ann. § 39-11-402(2) (1997). In State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994), this Court held that the statute attaching criminal liability for the conduct of another requires proof of an "intentional" culpable mental state. Knowing, reckless, and negligent mental states are insufficient. Tenn. Code Ann. § 39-11-302(a) (1997). For the evidence to be sufficient to sustain a conviction under the theory of criminal responsibility for the conduct of another, there must be proof that the Defendants intended, as defined in Tenn. Code Ann. § 39-11-302(a), to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense. Tenn. Code Ann. § 39-11-402(2). In addition, there must be proof that the Defendants solicited, directed, aided, or attempted to aid another to commit the offense. Id. The jury may infer the intent of the accessory from her "presence, companionship, and conduct before and after the offense. . . ." State v. McBee, 644 S.W.2d 425, 428-29 (Tenn. Crim. App. 1982).

## A. Graham's Conviction

Taking the facts in a light most favorable to the State, Graham's intent to kill the victim may be inferred from her asking Martin Giovi to kill the victim. The proof further showed that Graham had Rivera accompany her to Tennessee, in order to kill the victim. She drove the vehicle, rented by Defendant Smith, from Florida to Tennessee and showed Rivera where the victim lived. After the murder, Graham and Rivera drove back to Florida and returned the car to Alamo Car Rental. Graham returned to Florida without alerting the authorities about the victim's death. LaShawn Taylor testified that Graham and Rivera were very secretive and nervous, after they returned to Florida. Then, Defendant Graham fled to New York, while maintaining possession of Cleta Smith's jewelry. In New York, Graham stayed with Giovi and told him that Smith and her father paid someone to kill the victim and that she (Graham) had accompanied the man to Tennessee, where they shot the victim in the driveway. Graham was later arrested by the police and gave a statement attesting to the above facts. Hence, a rational jury could have found that Defendant Graham intended to assist with the commission of the murder of Aaron Smith.

## B. Smith's Conviction

Reviewing the facts in a light most favorable to the State, Defendant Smith, on numerous occasions, spoke of her intent to kill the victim or have him killed, if he were awarded custody of the children. Likewise, Shannon Jarnigan (Smith's cell mate) testified that Smith told her that she hired Graham's boyfriend (Rivera) to kill her husband. Moreover, Smith's intent to kill her husband can be inferred from her actions of driving to Florida to meet with Graham, renting the car Graham and Rivera used to drive to Tennessee to commit the criminal act, discussing with Rivera and Graham the fact that they had killed someone (in earshot of her daughter, Brittany Smith) and fleeing to Michigan soon after the killing. Consequently, we hold that a rational trier of fact could have found that Defendant Smith intended to promote and assist the commission of the murder of Aaron Smith. The evidence was sufficient to show that Defendant Smith solicited the aid of Defendant Graham and Rivera to commit the first degree murder of Aaron Smith.

Having reviewed the proof in the light most favorable to the State, as we are required to do, we find that the evidence is legally sufficient to support the jury's verdict as to both Defendants. The jury resolved all issues of credibility in favor of the State, and this Court may not reconsider the jury's credibility assessments. See State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). The Defendants are not entitled to relief on this issue.

## CONCLUSION

Based upon the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE